[No. B259997. Second Dist., Div. Five. Jan. 13, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS MIGUEL MATEO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

[*]Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication only as to the Introduction, Facts, and Duty to Instruct on Child Sexual Abuse Accommodation Syndrome section, and Disposition.

## COUNSEL

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KRIEGLER, J.**—Defendant and appellant Luis Miguel Mateo was convicted by jury of continuous sexual abuse of a child under the age of 14 (Pen. Code, § 288.5, subd. (a)),[1] based in part on expert testimony on child sexual abuse accommodation syndrome (CSAAS). In the published portion of this opinion, we hold the trial court had no sua sponte duty to give the pattern jury instruction (CALCRIM No. 1193) explaining the limited purpose of expert testimony on CSAAS.

Defendant's first jury trial, in which expert testimony on CSAAS was not presented, resulted in a hung jury.[2] Defendant was sentenced to the middle term of 12 years in prison after the guilty verdict in the second trial.

Defendant contends the trial court used an incorrect standard when it denied his motion objecting to the prosecution's exercise of peremptory challenges to excuse four African-American jurors. He further contends that the trial court erred in failing to sua sponte instruct the jury regarding (1) an expert witness's testimony on CSAAS and (2) the offense of lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) as a lesser included offense of continuous sexual abuse of a child under the age of 14. Defendant also argues he was prejudiced by ineffective assistance of counsel and cumulative error.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] On the prosecution's motion, the trial court dismissed three counts of lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) during the first trial.

We affirm the judgment.

## FACTS

*Prosecution*

I.T. was eight years old when defendant moved into her mother's apartment, where I.T. lived with her two brothers. Defendant first sexually abused I.T. when she was nine years old. I.T. testified in detail to five specific acts of sexual intercourse with defendant, which occurred when she was between the ages of nine and 12. I.T. also testified that defendant molested her about three or four other times in that same time period, although she did not remember specific details about those incidents.

After living with other relatives for a year when she was 17 or 18, I.T. moved into the house her mother and defendant shared in Las Vegas to reconnect with her mother. At that time, I.T.'s half sister, A.M., was nine or 10 years old. One evening, defendant screamed at A.M. while defendant and I.T.'s mother were drinking alcohol. Upset by defendant's conduct and concerned that A.M. might be victimized by defendant, I.T. told her mother about the sexual abuse that began when she was around A.M.'s current age for the first time. I.T. moved out of the house the same day, was unable to contact her mother, and out of fear for A.M.'s safety, reported the incidents to police within a few days of the argument.

Los Angeles Police Detective Paul Bowser investigated the case. During an interview with the detective, I.T. recounted the details of four of the five specific incidents of sexual intercourse with defendant. I.T. testified consistently regarding all five specific instances of sexual abuse at the preliminary hearing and at trial.

Detective Bowser and Officer Jose Ramirez conducted a recorded interview of defendant in Las Vegas. On Detective Bowser's request, Las Vegas Metropolitan Police Detective Chad Russell conducted a video-recorded interview of defendant the next day, which was played for the jury.[3] Defendant was advised of his *Miranda*[4] rights and confirmed that he understood the advisement. He knew that he was being questioned because I.T. accused him of sexually abusing her as a child. Defendant could not recall hurting I.T. He would sometimes "have some beers, but that didn't cause [him] to get up and go bother [I.T.] or anything." Defendant initially denied

---

[3] Detective Russell was assisted by a Spanish interpreter.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436, 444–445 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

any wrongdoing, and when the detective untruthfully suggested that DNA evidence had been collected, defendant said that they would not find anything, because he had not done anything.

The detective then suggested that maybe I.T. had taken advantage of defendant when he had been drinking and it was dark in the bedroom. He suggested that maybe, when defendant came home tired after a long day at work and had a few beers, I.T. had climbed on top of him in the dark and put his penis inside her. Defendant might not have realized that it was I.T. and not his wife until they had begun having sexual intercourse. Defendant might not have come forward with this information because he feared that I.T. would get into trouble. Detective Russell said that he had heard stories about I.T. having a lot of sexual intercourse with people and that she had been a prostitute at one point. Defendant said that he did not remember anything happening with I.T. and he did not know that I.T. had been a prostitute.

Detective Russell continued to suggest that I.T. may have taken advantage of defendant without his knowledge when he was drunk and/or sleepy and did not realize that I.T. was not his wife. Defendant remembered "them" getting on top of him more than two or three times, but he did not know if it was his wife or I.T. Detective Russell said that defendant should not protect I.T. He said that I.T. needed help, and it was her fault that defendant was being questioned. Defendant then admitted he had awoken with I.T. on top of him with his penis inside of her more than three times, and maybe five or six times. Defendant said he would sometimes go to bed drunk, so he could not remember the number of times it happened. He remembered that she got on top of him and that "there was penetration." I.T. got on top of him and put his penis inside of her vagina more than once or twice when he had come home from work tired. He would not fully wake up for about five minutes, but when he did he would tell her to get off of him. She would leave, but it made her angry. Until he realized it was I.T., the intercourse felt good. Defendant then said he just remembered I.T. getting on top of him once, when she was about 11. He did not tell his wife, because she had a bad temper. Defendant did not tell the detectives about it when they initially interviewed him because they asked him whether he had abused or hurt I.T., not whether she had put his penis in her vagina while he was asleep.

The prosecution presented the testimony of clinical psychologist Jayme Jones regarding the behavior of abused children generally. Dr. Jones had not interviewed or evaluated I.T. or anyone else involved in the case.

*Defense*

I.T.'s maternal aunt and grandmother testified that when I.T. was 17 years old, she told them that she did not want her mother and defendant to be together, and intended to break up the relationship.

I.T.'s mother did not believe defendant was sexually attracted to young girls. She never observed defendant acting inappropriately with her daughters or nieces. At the time of the alleged incidents, defendant was working at three jobs and was rarely home. She never left her children in his care. She contradicted I.T.'s testimony regarding two specific instances of sexual intercourse, one occurring on Halloween and another when the family went to Knott's Berry Farm. The mother also denied seeing defendant in the bathroom with I.T. on one occasion, as testified to by I.T. When I.T. moved back in with them, she acted jealous of defendant and wanted a lot of attention from her mother. I.T.'s mother had tried to talk to I.T. about the accusations, but I.T. refused to speak with her.

I.T.'s cousins and her close childhood friend testified that they did not believe defendant was sexually attracted to young girls, and that he had never acted inappropriately with them. I.T.'s two female cousins testified that defendant was working with their father on the Halloween night that I.T. said defendant molested her. The family had looked at photo albums for pictures of the Halloween in question, and defendant was not in any of the photos.

## DISCUSSION

Wheeler/Batson *Motion*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Juror No. 3539, Juror No. 1512, Juror No. 9705, Juror No. 0479*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Exercise of Peremptory Challenges and the* Wheeler/Batson *Motion*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 1063.

*The* Wheeler/Batson *Rule*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Analysis*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Duty to Instruct on Child Sexual Abuse Accommodation Syndrome*

Defendant next contends the trial court erred in failing to give a limiting instruction on the expert witness's testimony regarding CSAAS. In the alternative, he asserts that trial counsel was ineffective for failing to request such an instruction.

■ Expert testimony about CSAAS "is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, . . . such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse." (*People v. Stark* (1989) 213 Cal.App.3d 107, 116 [261 Cal.Rptr. 479] (*Stark*).) Defendant makes no argument that evidence of CSAAS was improperly admitted in this case; instead, he focuses on the absence of a limiting instruction on the use of the expert's testimony.

*Proceedings*

Clinical psychologist Dr. Jayme Jones testified on behalf of the prosecution regarding CSAAS. The prosecution had not presented expert witness testimony regarding CSAAS in defendant's first trial. Dr. Jones explained that CSAAS is a model for understanding the behavior of children who have been sexually abused. It dispels the myths that children in abuse situations fight back and immediately disclose the abuse. The model has five components: secrecy, helplessness, accommodation, disclosure, and recantation. Child abuse generally occurs in secrecy, signaling to the child that they are not supposed to disclose what has happened. Although there may be other individuals in the area at the time of the abuse, there will often not be others watching. Children do not fight their victimizers in many cases because they are physically weaker and have been socially conditioned not to say "no" to adults. Children adopt mechanisms to cope with the trauma. If the abuser is a family member, it is not unusual for the child to continue to show the abuser

---

[*]See footnote, *ante*, page 1063.

affection. It is also not uncommon for the victim to return to the home where the abuser is living even after the victim becomes an adolescent or adult. Most children delay disclosure if they disclose at all. Disclosure will often occur during an argument or in another volatile situation, when the victim feels something unfair has happened. Children may disclose when their parents deny them privileges, which causes them to be disbelieved. When the victim does disclose, there can be problems with memory, and details may merge together. Victims may recant their version of events in order to avoid talking about the abuse, or suffering other negative consequences of disclosure, such as familial disapproval or removal from the home.

The prosecutor questioned Dr. Jones regarding her familiarity with this case and regarding CSAAS's ability to predict whether abuse has occurred:

"Q: Now, have you yourself interviewed anybody related to this case or read any sort of reports related to this case at all?

"A: I have not.

"Q: And have you done any studies or done any sort of clinical evaluations of anyone related to this case?

"A: No.

"Q: Now does this model necessarily predict one way or the other whether someone was, in fact, sexually abused?

"A: Not at all. And one of the things [the doctor who authored CSAAS] later published was a paper basically stating he wished he hadn't called it a syndrome. Because 'syndrome' makes it sound like it is predictive, and it's not. It doesn't tell us whether or not a child has been abused. It simply explains their behavior if they have been abused."

Defense counsel did not request a limiting instruction with respect to the permissible uses of the CSAAS testimony. The trial court instructed the jury with CALCRIM No. 332[13] that it could give the expert's testimony whatever weight it felt appropriate. The court gave no other instructions regarding expert testimony.

---

[13] CALCRIM No. 332 reads in pertinent part as follows: "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching

*Standard of Review*

■ We review independently the question of whether the trial court has a duty to give a particular jury instruction. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].) " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].)" (*People v. Najera* (2008) 43 Cal.4th 1132, 1136 [77 Cal.Rptr.3d 605, 184 P.3d 732].)

*Sua Sponte Duty to Provide Limiting Instructions*

■ As a general matter, the Legislature has determined that limiting instructions need not be given sua sponte. "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added.) Our Supreme Court has consistently applied the concept set forth in Evidence Code section 355. " 'Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted.' (*People v. Cowan* (2010) 50 Cal.4th 401, 479 [113 Cal.Rptr.3d 850, 236 P.3d 1074].)" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590 [121 Cal.Rptr.3d 586, 247 P.3d 941]; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052 [16 Cal.Rptr.3d 880, 94 P.3d 1080] [no sua sponte duty to instruct on limited use of gang evidence]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5 [56 Cal.Rptr.2d 142, 921 P.2d 1] (*Humphrey*) [clarifying instruction on use of evidence of battered women's syndrome might be appropriate *on request*]; *People v. Collie* (1981) 30 Cal.3d 43, 63 [177 Cal.Rptr. 458, 634 P.2d 534] [limited purpose of prior criminal acts does not require sua sponte limiting instruction]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316–1317 [97 Cal.Rptr.2d 727] [no duty to give limiting instruction regarding evidence of other acts of domestic violence committed by defendant].)[14]

---

that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

[14] "There is a 'possible' narrow exception in the ' "occasional extraordinary case" ' in which the evidence ' "is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." ' (*People v. Hernandez[, supra,]* 33 Cal.4th [at pp.] 1051–1052, quoting *People v. Collie[, supra,]* 30 Cal.3d [at pp.] 63–64.)" (*People v. Murtishaw, supra,* 51 Cal.4th at p. 590.)

As pertinent here, the Legislature has determined that only one instruction need be given sua sponte on expert testimony. "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] *No further instruction on the subject of opinion evidence need be given.*" (§ 1127b, italics added.)

■ The trial court complied with its obligation to instruct pursuant to the requirements of section 1127b by providing the jury with the pattern instruction on expert testimony found in CALCRIM No. 332. Under the plain language of the final sentence of section 1127b, no further limiting instruction on the use of CSAAS was required.

Despite the plain language of section 1127b and Evidence Code section 355, defendant argues that *People v. Housley* (1992) 6 Cal.App.4th 947, 957 [8 Cal.Rptr.2d 431] (*Housley*) imposes a sua sponte duty on the trial court to instruct the jury on the use of expert testimony on CSAAS. The principles are set forth in CALCRIM No. 1193, which states: "You have heard testimony from _____ <*insert name of expert*> regarding child sexual abuse accommodation syndrome. [¶] _____'s <*insert name of expert*>testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not _____'s <*insert name of alleged victim of abuse*> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

The *Housley* court concluded "that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley, supra,* 6 Cal.App.4th at pp. 958–959.)

In the lone decision arguably consistent with *Housley*, Division One of the Court of Appeal, Fourth Appellate District, concluded that when an expert testifies to CSAAS, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [249 Cal.Rptr. 886] (*Bowker*).) Whether the *Bowker* court intended to hold that the limiting instruction must be given sua sponte is unclear, as the opinion does not expressly discuss the point. Any doubt as to the intent of the *Bowker* court has been eliminated, because the same court that decided *Bowker* held in three subsequent cases that the limiting instruction must be given "if requested." (*Stark, supra*, 213 Cal.App.3d at p. 116; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 [256 Cal.Rptr. 446] (*Sanchez*), disapproved on other grounds in *People v. Jones* (1990) 51 Cal.3d 294, 307 [270 Cal.Rptr. 611, 792 P.2d 643]; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587 [252 Cal.Rptr. 596] (*Bothuel*), disapproved on another point in *People v. Scott* (1994) 9 Cal.4th 331, 347–348 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) We are confident that *Stark, Sanchez,* and *Bothuel* accurately describe the intention of the decision in *Bowker*.

Defendant's contention, and the holding in *Housley*, are at odds with our Supreme Court's decision in *Humphrey, supra*, 13 Cal.4th 1073. Throughout its opinion in *Humphrey*, the court repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request. (*Id.* at pp. 1088, fn. 5, 1090–1091 (conc. opn. of Baxter, J.), and 1100 (conc. opn. of Brown, J.).) The majority opinion in *Humphrey* does not require a sua sponte limiting instruction on the use of evidence of battered women's syndrome; it suggests that an instruction would be discretionary on request: "If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction *might* also be appropriate on request, given the statutory prohibition against use of this evidence 'to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.' (Evid. Code, § 1107, subd. (a); see CALJIC No. 9.35.01 (1996 new) (5th ed. Supp.).)" (*Id.* at p. 1088, fn. 5, italics added.) Battered women's syndrome is analogous to CSAAS. Both syndromes explain that victims' "seemingly self-impeaching" behaviors—e.g., delayed disclosure, returning to the home—are consistent with their claims of having been beaten, raped, or sexually molested. (See *People v. Brown* (2004) 33 Cal.4th 892, 906 [16 Cal.Rptr.3d 447, 94 P.3d 574]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 [283 Cal.Rptr. 382, 812 P.2d 563].) We can think of no reason why a duty to instruct should be imposed in one situation and not the other.

Based upon statutory and decisional law, we respectfully disagree with *Housley*'s holding that a limiting instruction is required sua sponte in all cases involving expert testimony on CSAAS. The instruction need only be given if requested.

*Harmless Error*

Assuming the trial court erred in failing to sua sponte instruct the jury on the limited use of CSAAS evidence, any error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*Bowker, supra*, 203 Cal.App.3d at p. 395; *Housley, supra*, 6 Cal.App.4th at p. 959.) Defendant cannot establish a reasonable probability of a more favorable verdict if a limiting instruction had been given. Where, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence. (See *Stark, supra*, 213 Cal.App.3d at pp. 115–116; *Housley, supra*, at p. 959.) Dr. Jones clearly stated that she had not interviewed or evaluated anyone involved in the case, and that CSAAS was not intended to predict whether a child had suffered abuse. The trial court instructed the jury that in considering expert testimony, it "must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

The prosecution presented a solid case against defendant. I.T. testified to her version of events consistently and in detail when speaking with detectives and when testifying at the preliminary hearing and trial. Defendant admitted to officers that he had sexual relations with her on multiple occasions. Although defendant suggests his confession was gained through "trickery," he does not separately contend that his statements were involuntary. "We note that the ' "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent [statement or admission] involuntary." [Citation.]' " (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1484 [22 Cal.Rptr.2d 126].) The officers urged defendant to be truthful to help I.T. He was not promised leniency or any other benefit.

The witnesses who testified on defendant's behalf said little to refute I.T.'s account of the incidents, nor could they, considering that according to both I.T. and defendant, there were no witnesses. At most, the defense witnesses suggested an alibi for a molestation that occurred on Halloween and another on the day of a trip to Knott's Berry Farm, but those were only

two of many incidents for which there was no refutation. With respect to I.T.'s motive to separate her mother from defendant, the jury could reasonably believe her animus arose from the molestation and I.T.'s fear for her young sister, because she disclosed what had happened during an argument over defendant's treatment of her sister.

Defendant argues that prejudice is established by the fact that the first jury, which did not hear evidence on CSAAS, was hung nine to three in his favor. He reasons that the CSAAS evidence tipped the balance in favor of the prosecution in his second trial. Defendant's speculation on this point does not establish prejudice because he does not contend that the CSAAS evidence was improperly admitted. Even if a limiting instruction had been given, the jury would have heard the same evidence, which provided a reasonable explanation for I.T.'s seemingly inconsistent behavior.

We reject defendant's argument that the length of deliberations and the fact that the jury requested readback of testimony establishes that his case was close, and that he was prejudiced by lack of instruction. Defendant does not quantify the time the jury spent in deliberations, but by our calculations it was approximately six and a half hours, including readback of testimony. Juries sometimes return a verdict quickly in close cases, and other times engage in extended deliberations in cases with overwhelming proof of guilt. Here we find no correlation between the length of deliberations and the strength or weakness of the prosecution's case. Consistent with making a careful decision, "we assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties." (*People v. Walker* (1995) 31 Cal.App.4th 432, 438 [37 Cal.Rptr.2d 167].) "[W]e find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Id.* at p. 439.) The jury approached its task with care, requesting a rereading of very specific testimony. The length of deliberations established no more than that the jury took its time to reach a verdict in a case with significant ramifications.

Defendant does not contend the prosecution used the CSAAS testimony in an improper fashion in argument to the jury. We are satisfied that CALCRIM No. 1193, had it been given, would not have added to what the jury already understood. Prejudice has not been shown.

### Ineffective Assistance of Counsel

Defendant alternately contends counsel was ineffective in failing to request a limiting instruction. "To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient,

falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940 [42 Cal.Rptr.2d 636, 897 P.2d 574], abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666].) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation. [Citations.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

Because the record sheds no light on why counsel did not request CALCRIM No. 1193, we cannot reach the merits of the claim of ineffective assistance of counsel. And on the record presented, there is no basis to conclude counsel's performance was deficient. As a tactical matter, competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting expert testimony supporting the victim's credibility. "A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Moreover, in light of our conclusion that any error was harmless, defendant cannot show he was prejudiced by counsel's purported error. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839] [defendant must establish prejudice to obtain relief on an ineffective assistance claim].)

*Lewd or Lascivious Act Instruction*[\*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*The Accusatory Pleadings Test*[\*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Ineffective Assistance of Counsel*[\*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[\*]See footnote, *ante*, page 1063.

*Cumulative Error*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Mosk, Acting P. J., and Baker, J., concurred.

On January 15, 2016, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 30, 2016, S232405. Kruger, J., did not participate therein.

[*] See footnote, *ante*, page 1063.